## Wells v. Derrickson, et al.

(Decided March 11, 1919.)

## Appeal from Lee Circuit Court.

1. Vendor and Purchaser—Bond for Conveyance of Land.—One who holds a title bond for land may authorize his grantor, either verbally or in writing, to sell and convey the land; and the conveyance of the legal title holder will conclude the equitable interest of the title bond holder.

2. Vendor and Purchaser—Agency—Consideration.—No consideration is required to support a power to sell land or an agency for that purpose.

3. Frauds, Statute of—Parol Authority to Sell Land—Agency.—An agency to sell land may be created by parol; no writing is necessary as such relation does not come within the statute of frauds.

4. Vendor and Purchaser—Title Bond—Agency—Estoppel.—Where one who holds a title bond for land, writes another directing him to sell and convey the land, and such letter is exhibited to the prospective purchaser, who thereupon buys the land from the agent, the holder of the title bond is thereafter estopped to assert claim to the land.

T. T. COPE and E. E. HOGG for appellant.

SAM HURST, E. C. O'REAR, A. F. BYRD, W. O. DAVIS and J. C. JONES for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

Appellee, John H. Derrickson, was the owner of a tract of land of about 75 acres, situated on Sinking Fork of Millers creek, in Lee county, and on September 20, 1913, he sold the same to George Boothe for $240.00; $5.00 in hand paid, $120.00 to be paid in twelve months from date, and the balance in twenty-four months. Boothe executed to Derrickson two notes for the unpaid purchase money—one for $120.00 and the second for $115.00. Derrickson executed and delivered to Boothe the following title bond:

"Torrent, Ky., Sept. 20, 1913.

"I have on this day sold and conveyed to Geo Booth all of the land I owned on the Sinking Fork of Millers creek running with Tom Boothe line; then with Brown Low Smith's line; then with the Clay City Bank's line, for two hundred and forty dollars, one hundred and twenty

dollars to be paid in twelve months, and one hundred and twenty dollars in twenty-four months. Party of first part to make deed.

"JOHN H. DERRICKSON."

Boothe immediately took actual possession of the land, placed a tenant on it from whom Boothe collected rents and through whom he exercised control over the lands. When the first note became due, in September, 1914, Derrickson went to see Boothe and insisted upon payment, but Boothe was unable to pay and so informed Derrickson, and arranged for additional time. The second note fell due on September 20, 1915. Boothe failed to pay either of the notes in full. On April 22, 1914, Derrickson gave an order on Boothe for $38.19, in which order it was stated by Derrickson: "I will let it be applied on the last note I hold on the land." This order was duly accepted by Boothe and paid in merchandise from Boothe's store. Boothe also paid some small sums on interest on the notes. Derrickson wrote Boothe several letters with relation to the past due notes. In the meantime Derrickson transferred the first note to J. P. Crain, and Crain placed it as collateral to other notes at the Hargis Commercial Bank in Jackson. Some time in 1915 Derrickson, who lived at Jackson, went for the third time to see Boothe with reference to the payment of the notes. He found Boothe on the lands in controversy and they talked the matter over. Before that Boothe had offered to surrender the lands to Derrickson and cancel the trade, but Derrickson did not want the lands back and insisted upon having the money. On this last visit Boothe again told Derrickson that he did not have the money to pay the notes and offered to surrender the title bond and possession of the land to Derrickson if Derrickson would surrender to him the two notes, but Derrickson explained that one of the notes had been transferred to Crain and that Crain had placed it with the bank and that he could not surrender that note to Boothe. It was finally agreed, however, that Boothe would make a final effort to borrow the money at Beattyville, and if he could so do would pay the notes, and Derrickson was to convey the lands to Boothe by deed. But if Boothe was unable to obtain the money with which to pay the notes he was to go to Jackson and surrender the title bond and posession of the land to Derrickson, and allow him to sell the land to another, and thus obtain the

money which Boothe was unable to pay. Boothe attempted to obtain the money but was unsuccessful. He did not go to Jackson to see Derrickson, but he wrote him a letter, the contents of which are the subject of dispute in this controversy.

The letter is lost. Boothe contends that he wrote Derrickson that he was willing to surrender the title bond and possession of the land to him if Derrickson would bring and deliver to Boothe his two notes, executed for the purchase money of the land. Derrickson did not and does not claim to have delivered or offered to deliver the notes to Boothe, but he claims he acted directly upon Boothe's letter, which he says was in substance as follows:

"Torrent, Ky.

"I have been to Beattyville trying to get the money to pay these notes off that I owe you. I have been unable to get the money at Beattyville or anywhere else, and you can go ahead and sell the land to Crain or any one else that you want to as I am unable to pay off the notes."

Mrs. Derrickson received the letter from the post office and took it to appellee, J. P. Crain, who exhibited it to his brother, M. S. Crain, and they and Derrickson testify concerning its contents. Acting upon the letter, Derrickson sold and conveyed the land to J. P. Crain in consideration of $120.00, which was the amount of the first note given by Boothe to Derrickson, and transferred by Derrickson to J. P. Crain. This deed, while dated September 3, 1915, was acknowledged by Mrs. Derrickson before M. S. Crain, notary public, on October 13, 1915, and by John H. Derrickson on February 7, 1916. It was recorded in the office of the clerk of the Lee county court on January 15, 1917. At the time of the execution of the deed to J. P. Crain, Boothe was in possession of the land by a tenant, but it had been agreed between Boothe and Derrickson that in case Derrickson accepted the land the tenant whom Boothe had placed on the land was to be permitted to remain on the lands for the balance of the term for which Boothe had rented it, and should respond to Derrickson. Derrickson did not come to see Boothe any more after the execution of the deed, but Boothe claims to have written Derrickson several letters with reference to the land and to have offered to pay the notes. To these several letters Derrickson made no reply.

He does not contend that he accepted Boothe's proposition by letter or otherwise, except that he acted upon the letter and without further communication with Boothe deeded the land to Crain. It is also admitted by Boothe as well as by appellant, Jack Wells, that the making of the deed by Derrickson to Boothe and its recordation was common talk in the community where they lived and that they each had such information before Wells bought the lands. Matters drifted along until 1917, when oil was discovered in the vicinity of this land, and the land began to appear to have considerable value, and on August 30, 1917, George Boothe and wife transferred to appellant, Jack Wells, the title bond, executed to Boothe by Derrickson, by the following indorsement on the back of the bond: "For and in consideration of five hundred dollars I assign all the right, title and interest of the within bond to Jack Wells.

"This Aug. 30th, 1917.

"DIXIE BOOTHE.
"GEO. W. BOOTHE."

The real consideration for the assignment to Wells, as appears from the evidence of Wells and Boothe, was $535.00, $300.00 of which was paid to Boothe by Wells, and Boothe assumed the payment of the two notes of $235.00 to Derrickson.

While Boothe and Wells both knew of the deed of Derrickson and wife to J. P. Crain, and that it was of record on the 30th of August, 1917, it is equally true that J. P. Crain knew that George Boothe had purchased the land in question and held a title bond therefor, at the time Crain purchased of Derrickson, on September 13, 1915, and J. P. Crain at the time held, or at least had held, one of the Boothe notes given to Derrickson for the purchase price of the land, of which the title bond was the evidence of transfer.

This action was instituted by Wells against J. H. Derrickson and wife and J. P. Crain and wife, praying a cancellation of the deed of Derrickson and wife to J. P. Crain, and that Derrickson and wife be compelled to convey said land to plaintiff Wells in lieu of Boothe, to whom the title bond was made in the first instance. The title bond from Derrickson to Boothe with the assignment thereon to Wells was attached to the petition and made a part thereof. Appellees, by answer, relied upon the contract and letter evidencing the same, which Boothe

wrote to Derrickson informing him he could not get the money to pay the notes, and directing Derrickson to sell the land to Crain, or to whomsoever he could, as an estoppel as well as an authority to Derrickson to sell Boothe's equitable interest in the land. The answer further avers that at the time of the execution of the deed by Derrickson and wife to Crain that Derrickson was in the actual possession of the land and had a tenant residing thereon and that Derrickson delivered the actual possession of the land to Crain at the time of the execution of the deed, and that Crain thereafter held actual possession of the land through a tenant who occupied the same for Crain, and that said tenant was in the actual, open possession of the land on the 30th of August, 1917, when Boothe and wife assigned and transferred to appellant Wells the title bond in question. By the third paragraph of the answer defendant relied upon the champerty statute, and averred that at the time of the alleged purchase of the land by Wells, the defendant Crain was in the actual adverse possession of the land and that Wells at the time he made said purchase knew of the ownership and possession of Crain, and that the said assignment of the title bond and attempted transfer of the lands by Boothe to Wells was champertous and void and passed no title to Wells.

By reply Wells traversed said allegations and put in issue the possession of Crain and alleged actual possession in himself and his vendor at all times set forth in the answer.

The action was prepared, and we think correctly so, upon the idea that if Boothe wrote Derrickson the letter which Derrickson and Crain now contend was received by them from Boothe, it not only amounted to an estoppel against Boothe and his assignee but was the equivalent of a power and agency to Derrickson to sell and transfer the equitable interest of Boothe in the property; but if the letter contained only the proposition which Boothe and Wells assert it contained, then Derrickson had no right to sell and convey the land to Crain, and Crain was not justified in making the purchase or accepting the deed from Derrickson. Upon this question a considerable amount of evidence was taken in the form of depositions. With respect to the letter, appellant Wells knew nothing and does not testify except as to such information as he had received from his transferror

Boothe. On kindred subjects Wells was asked the fol-lowing questions and gave the answers indicated:

"Q. Did you make this purchase from Boothe with the understanding that Derrickson had conveyed this property to Porter Crain? A. I knew he had done that, yes, sir. Q. When did you learn that Derrickson had conveyed this land to Porter Crain? A. Along in the year 1915. Q. About what time in that year? A. Along in December. . . . Q. What agreement did you have as to the purchase price of this land with Boothe? A. I was to pay him $300.00 and pay off the purchase money notes. Q. What purchase money notes? A. The notes he gave to Derrickson. . . . Q. Did you know about any part of the purchase price of this land ever having been paid to any one? A. Yes. Rube Chapman paid $38.19. I know Derrickson owed Chapman $38.19 store account. Boothe paid it to him. Chapman goes to Der-rickson after his money and he says I have not got the money but I have sold a piece of land to George Boothe down on Sinking, . . . I have got the order in the house in his handwriting. . . . George Boothe paid off the $38.19 order that was sent to him. Q. Are you able, willing and ready to pay the balance of the purchase price of this land as contracted between John H. Derrick-son and George Boothe? A. Yes, sir, ready at any time."

With respect to the possession of the land at the time of its transfer to Crain, Wells testified:

"Q. Was George Boothe in possession of it? A. Yes, sir, he had a tenant on it. Q. Who was he? A. 1913 and 1914, Jerry Gilbert stayed there under George Boothe. Q. Who was George Boothe's tenant during the year 1915? A. Jim Ann Jones. Q. Who was George Boothe's tenant during the year 1916? A. A. J. Jones. Q. Who was in possession of this land at the time you purchased it from Boothe? A. A. J. Jones and Uncle George Boothe."

With respect to when appellee Wells received infor-mation from his brother John Wells, concerning the deed from Derrickson to Crain, Wells was asked:

"Q. That was nearly or quite two years before you purchased it from Boothe? A. Yes, sir."

George Boothe testified as follows:

"Q. I will ask you on the 13th day of October, 1915, who was in possession of this tract of land? A. Why,

I was. Q. Did you reside on it or have a tenant on the land at that time? A. I had a tenant on it. Q. I will ask you if you ever, at any time agreed with him (Derrickson) that he might sell this land, or state to the examiner what conversation occurred between you and Mr. Derrickson in regard to the payment of these notes? A. I told him if I did not pay it against a certain time, if he would bring the notes in, I would give up the land and bond to him, and he could do as he pleased with it. . . . Q. Do you remember where that conversation occurred? A. Yes, sir, right up there on the place. Q. On the land? A. Yes, sir. Q. What did he say in regard to the turning over of the notes? A. He said he had one note but the other one was sold and he could not get it at that time. . . . Q. Have you ever at any time been able to get possession of these notes? A. No, sir, never have. . . . I paid the interest about three times. Q. They allege in their answer that you wrote a letter to John Derrickson, stating to him that he could sell this land to who ever he pleased. Do you have any recollection of that? A. I wrote him several letters and never kept any one letter in my mind. I do not know what I wrote. . . . Q. I will ask you if you did not tell him you would give up the land if he would give up the notes? A. Yes, sir, I would give up the land if he would give up the notes at that time. Q. Did he ever do that? A. He would not do it. . . . Q. He never did do that? A. No, sir. . . . Q. Did he ever at any time present to you these notes for payment after they were both due? A. No, sir. . . . Q. When the note became due he came to see you another time? A. Yes, sir. Q. What was done at that time? A. Well, he wanted to pay it and I told him I could not pay it at that time, and he wanted the land back, and I told him if I did not pay it against a certain time, if he would bring in the notes I would give up the bond and the possession of the land. Q. Didn't you, by way of refreshing your recollection, Mr. Boothe, didn't you tell him that you would see if you could not borrow the money by giving a mortgage on this property and some other property you had? A. I do not know whether I did or not; I did try to get the money. . . . Q. And instead of going to Jackson, didn't you later in the week write him and tell him you had failed to get the money and that you could not pay the account and that he could sell it to Mr. Crain or

anybody else he could to get the money? A. No, I think not; I will have to read the letter. Q. You do not say that you did not, do you? A. No, sir. Q. You did write him some letters? A. I wrote him several letters. Q. Did you write him a letter soon after he was down here to see you, after you say you could not get the money you would let him have the land? A. Yes, sir. . . . I know I told him if he wanted the land back to bring my notes and I would give up possession and the bond. Q. Did you, after that, ever offer to pay the notes? A. I wrote him several letters that I had the money to pay it, and he did not answer.''

In answer to the question whether he knew that Derrickson and sold and deeded the land to Crain, Boothe said: ''I heard it but I did not know it to be so.'' . . .

In rebuttal Boothe was asked: ''State whether or not you ever authorized him (Derrickson) to sell the land to any one? A. No, sir, not unless I got the notes. Q. How many letters did you write and have written to Derrickson? A. I wrote three myself, after I heard he had sold it to Mr. Crain.''

The balance of the testimony for appellant, plaintiff below, largely tended to establish possession in Boothe from the time he purchased up until the sale and transfer to appellant Wells, in August, 1917.

For appellees, John H. Derrickson testified that he purchased the land in controversy from one Stamper, and afterwards rented it for several years to different tenants, and thus held possession, and that he executed to Geo. W. Boothe the title bond in evidence, in consideration of $240.00. With respect to the first note Boothe said:

''A. No, sir, I did not hold the note. Q. What did you do with it? A. I made an arrangement with Mr. Crain to get the money on it; had it put in the Hargis Commercial Bank. Q. You had sold Mr. Crain the note? A. Yes, sir. Q. Mr. Crain let the Hargis Commercial Bank have it as collateral security? A. Yes, sir. Q. Did you tell Mr. Boothe when you first went to see him where the note was and what you had done with it? A. Yes, sir.''

In speaking of what occurred between himself and Boothe upon one of his visits Derrickson said:

''Well, he told me that he did not have the money and could not get it, but he would go to Beattyville and see if

he could not get the money, and he would come back and see me, but he did not do it; but he didn't come back and I come and paid the interest on the note myself again. . . . I went to see Boothe about it and he told me he would go to Beattyville and see if he could borrow the money; he would go to Beattyville on Saturday and come up Monday, and he would pay it off if he could get the money, and if he could not get the money he would let me have the land back; I told him I did not want the land back because I did not have the money to pay the note off with. There was $120.00 due again and I did not feel like sacrificing the land for the whole note that was in the bank here, and I would have to give the land to Porter Crain and he said he would come up Monday and pay it off, but he did not come at all Monday. Monday I got news the land was mine and to go ahead and let Porter Crain or anybody I wanted to have it, he had done all he could do about it. Monday came and he still did not come and in a few days later he wrote me a letter and told me to go ahead and let somebody else have the land or do something with it, he could not pay for it; go ahead and do as I pleased about it. Q. State the contents of that letter, the substance of it? A. Well he just wrote to me and told me that he could not get the money; he had tried to get the money and could not, and that I would just have to go ahead and let Mr. Crain take the land or do the best I could about it; that he could not pay for it. Q. Was anything said in that letter about you returning the notes or the title bond, or anything of that kind? A. No, sir, not in that letter there was not.''

Concerning the tenant on the land Derrickson testified:

"He (Boothe) asked me if I would take the lands back; if I would leave him on the land if I took the land back; if I would be willing to leave him (the tenant) on the land and let him go on as he was, if I took the land back. I told him yes, he could leave the man on it and I would not make any objections to him.''

Mrs. Derrickson stated the substance of the letter from Boothe to her husband as follows:

"Well he began his letter and said that, I will tell you the substance that was in it, I may not recollect every word but the substance was to let Mr. Crain have the land that he was not able to pay for it, and he would have to take the land back or let Mr. Crain have it; that he was

not able to pay for it. Q. Was anything said in that letter from Mr. Boothe about Derrickson sending the notes to him, or about the title bond? A. No, sir.''

J. P. Crain states the contents of the letter as follows:

''Well, Boothe said as he had failed to get the money to pay for this land he could not pay for it, he hereby turned the land back to you. You can do as you please with it, sell it to Mr. Crain or anybody you can for all you can get out of it.''

M. S. Crain, brother of appellee, J. P. Crain, testified that the letter in substance was as follows:

''I have been to Beattyville trying to get the money to pay these notes off that I owe you. I have been unable to get the money at Beattyville or anywhere else, and you can go ahead and sell the land to Crain or any one else you want to, as I am unable to pay off the notes.

''Q. Was anything said in that letter about the title bond? A. No. sir.''

It would appear from the weight of the evidence that the letter which Boothe wrote to Derrickson informed Derrickson that Boothe was unable to pay the notes and that he desired to rescind the contract, and authorized Derrickson to sell Boothe's equity in the land to Crain, or to whomsoever might desire to purchase it. An agency to sell land need not be in writing and where the legal title is in the attorney in fact, the equitable owner may either verbally or by writing, direct the legal titleholder to sell and convey the land, and such sale will conclude the equitable owner. Clayton v. Walton, 6 J. J. Mar. 523; Talbot v. Bowen, 1 A. K. Mar. 437; Isaac v. Gearheart, 12 B. M. 231; Whitworth v. Pool, 29 R. 1104; Shadwich v. Smith, 147 Ky. 159.

Where one owning an interest in land, acquiesces in or directs the sale thereof by another, he will be estopped by his conduct to thereafter assert his claim to the land. Foster v. Shreve, 6 Bush 519; Alexander v. Woodford S. L. Co., 90 Ky. 224; Spencer v. Milliken, 4 R. 858.

The letter written by Boothe to Derrickson and exhibited by Derrickson to Crain, the purchaser, before Crain bought the land, was sufficient to justify Crain in purchasing the land and therefore estopped Boothe and his grantee from thereafter claiming the land. The rule perhaps would be otherwise if Wells had been an innocent purchaser, but this he does not claim, and the evidence

shows Wells to have been in full possession of all the facts at the time he parted with his money.

Another insistence for appellant Wells is that even conceding that the letter relied on by appellees contained in substance what they claim it did, it was without force because not supported by a sufficient or any considera-tion.   Conceding these facts, the object of the letter was to induce Derrickson to take the land back, or sell it to another, and thus relieve Boothe of the payment of his notes, $235.00, and interest.   Boothe could not pay and the notes were giving him much worry, and he was very anxious to be rid of them, and in surrendering the land to Derrickson, or empowering him to sell it, he thus re-lieved himself of his obligation to pay the purchase price.   This was sufficient consideration for a power, had it re-quired a consideration.   Certainly as an estoppel, and such it was, no consideration was required.   One who en-courages or induces another to buy land will be estopped from afterwards setting up any prior claim he may have had.   Ratcliffe v. Bellefonte Iron Works Co., 87 Ky. 559; Sale and others v. Crutchfield, &c., 8th Bush 636; Wim-mer v. Fickin, 14 Bush, 193; Ringo, et al., v. Warder, &c., 6 B. M. 519; Harrison & Gray v. Edwards & Clark, 3 Litt 340; Beal v. Barclay, &c., 10 B. M. 263; Simon, &c. v. Gouge, 12 B. M. 157; Breeding v. Stamper, 18 B, M. 178; W. W. Foster v. T. T. Shreve, &c., 6th Bush 519.

Conceding that Boothe wrote the letter claimed by ap-pellees, and that Crain, after being made familiar with its contents, purchased the land on the strength of the letter, would Boothe be entitled to specific performance of the contract by Derrickson and Crain?

We are firmly of the opinion that Boothe could not do so.   If he could not, then his assignee, Wells, who took with full knowledge of all the facts, could not do so. Derrickson and wife had divested themselves of title to the land long before Wells became interested in the title bond, and this fact was known to Wells at the time and long before he purchased the property.   Wells also knew of the fact that Boothe and Derrickson had been attempt-ing to rescind their trade by Boothe surrendering the title bond and possession, and Derrickson the notes. Whether Wells knew the contents of the letters which Boothe sent to Derrickson, especially of the one relied on by appellees in this case, is not important in view of the fact that he knew that Derrickson had resold the land

to Crain, for that was enough to put Wells upon inquiry, and had he made diligent inquiry the existence of the letter would have been divulged to him by Derrickson and Crain and he would have been saved his money.

The property in question appears, from the evidence, to now be worth a large sum of money.   In 1915 Boothe was trying to get Derrickson to take the land back and release him from his obligation to pay for it and Derrickson was attempting to compel Boothe to pay the notes and take the land.   Thus they played with a fortune, not knowing, each trying to thrust it upon the other. When they awoke to the real value of the property for oil each began to claim it, and to assert his right to it. Boothe yielded his right by the letter which he wrote in 1915, but he was unaware of the immense value of the property, and Crain was compelled to take the land instead of $120.00, much to his disappointment.  Had Wells established, by the weight of the evidence, that the contents of the letter, which Boothe is alleged to have written, was as stated by him, which amounted to a mere proposition to return the land and title bond to Derrickson on condition that Derrickson would return to Boothe the notes, the result of this lawsuit would necessarily have been different because the rights of the parties would have been different.  But Boothe does not claim to know the contents of the letters which he wrote.   He frankly admits that he does not know what he wrote, saying: ''I wrote him several letters, but never kept any one letter in my mind; I do not know what I wrote.''

Complaint is made by appellant that appellee Hurst, by threats and intimidation, prevented the witness Boothe from testifying to the contents of the letter in question. The substance of the evidence upon that point is that Hurst sent word to Boothe and also told Wells' attorneys that Boothe had written a letter to Derrickson in substance the same as proven upon the trial, which Hurst stated would prevent Wells' recovery.  Whether this prevented Boothe from giving stronger evidence than he otherwise would have given, we are unable to say, but in view of the fact that Boothe admits that he wrote Derrickson several letters but can not remember the contents of any one of them, and does not know what he wrote, we are persuaded that the evidence of Boothe upon the point would not have been materially different from what

it is had appellee Hurst said nothing, since the pleadings of appellee expressly relied upon said letter.

Appellant also contends that the deed from Derrickson to Crain amounted to only a mortgage to secure the debt of Crain. This can not be true since Boothe consented to the sale absolutely and was relieved of his obligation to Derrickson.

For the reasons indicated the judgment is affirmed. Judgment affirmed.